**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| EUGENE SEABROOKS,<br><br>               Petitioner,<br><br>         v.<br><br>CHARLES WARREN, *et al.*,<br><br>               Respondents. | Civil Action No. 13-3703 (MAS)<br><br>**OPINION** |

**SHIPP, District Judge**

    This matter comes before the Court on Petitioner's amended petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. (ECF No. 67.) Following an order to answer, Respondents filed a response to the Petition (ECF No. 72), to which Petitioner replied. (ECF No. 74.) For the following reasons, the Court denies the Petition, and denies Petitioner a certificate of appealability.

I.    **BACKGROUND**

    In its opinion on direct appeal, the Superior Court of New Jersey, Appellate Division, summarized the factual background of Petitioner's conviction as follows:

> On August 20, 1994, police officers, including Lieutenant Bradley, discovered a Cadillac which appeared to have struck the concrete barrier of the bridge on North 11th Street at 7th Avenue in Newark. They found Anthony Lewis's body slumped in the vehicle, with bullet wounds to the head, back[,] and left arm. Lewis died from a gunshot wound to the brain. Police recovered nine .40 [caliber] shell casings at the scene and some bullets that had lodged in a nearby house.

Christopher Jackson testified that just before the shooting, he and a friend, known as Black, were proceeding down William Street in Newark with the intention of borrowing some money from [Petitioner], a good friend.   Jackson spotted [Petitioner] and [Petitioner]'s close friend, Alkabir Sorey, and asked [Petitioner] for money. While [Petitioner] was reaching for the money, [Petitioner] said that he and Sorey were having a dispute with some guys in a blue Cadillac, who were trying to "get" Sorey.   After Jackson and Black left, they saw a blue Cadillac in the area.   They returned to the spot where they had encountered [Petitioner] with the intention of warning [Petitioner] that the Cadillac was still in the area.   No one was there.   As they were driving through the area, they saw a Cadillac that appeared to have crashed on the bridge near 7th Avenue.   As Jackson was pulling over toward the crowd near the scene, he overheard [Petitioner] say "you see my work, you see my work."

After Bradley returned to the police station from the crime scene and was in the process of storing evidence, he was informed that [Shawn] Taylor and Taylor's cousin, Marvin Freeman, had witnessed Lewis's murder.   Bradley interviewed Taylor, who identified the shooters as [Petitioner] and Sorey.  Bradley assembled a photographic array which included a photo of [Petitioner], and another which included a photo of Sorey.   Taylor selected [Petitioner]'s photograph from one array, and Sorey's photograph from the other array.  Based on this information, Bradley secured arrest warrants for [Petitioner] and Sorey who were believed to reside at 215 North Ninth Street in Newark.   [Petitioner] was arrested two days later.

On November 10, 1994, Detective Frank recovered a gun during a search of Sorey's residence at 215 North Ninth Street.  A ballistics expert testified that all of the casings and the bullets recovered at the scene of Lewis's murder were fired from the recovered handgun.

[Petitioner] and Sorey were indicted for Lewis's murder on January 4, 1995.  Assistant Prosecutor DeMarco testified that jury selection began on October 1, 1996, and continued through October 2, following which Judge Fast conducted a *Wade* [*v. United States*, 388 U.S. 218 (1967)] hearing.   At that hearing, Bradley described the procedures he used in putting together a photographic array, and said that Taylor selected [Petitioner]'s photograph.   The defense called Taylor as a witness.   He testified that while police did not prompt him to select [Petitioner]'s photograph, he now believed that he could not be sure that [Petitioner] was one of the people who murdered Lewis.   He also testified that in addition to the photo

2

arrays, he was shown a picture of a man wearing a "red hoody" because the person involved in the shooting wore a "red hoody." He identified the person depicted in the photo based on his garment.

DeMarco testified that on the Friday preceding jury selection, he met with Taylor late in the afternoon. DeMarco started to review Taylor's statement with him. He described Taylor as cooperative but very upset. In fact, Taylor was crying throughout most of the interview. After the interview, Taylor took DeMarco to the scene of Lewis's murder, and reviewed what had occurred.

During that weekend, Taylor was arrested and incarcerated at the Essex County Jail. Before DeMarco could talk to him at the jail, someone posted Taylor's bail. At the commencement of the *Wade* hearing on October 2, DeMarco was unable to locate Taylor, and was surprised to discover that he had been brought to the hearing by one of the defense attorneys and that Taylor intended to testify for the defense.

Before the jury was sworn, DeMarco announced that Taylor had not appeared in court. Detectives from the homicide squad, with the help of the FBI, were unable to locate Taylor. Therefore, on November 6, 1996, the trial judge dismissed the indictment without prejudice.

[Petitioner] secured Taylor's release from jail prior to the October 2, 1996, *Wade* hearing. He gave Angela Jordan, the mother of one of his children, $750 to post Taylor's bail. At [Petitioner]'s request, Sheila Goodman transported Taylor from Williamsport, Pennsylvania, to her apartment in Bloomfield, and then to Wilmington, North Carolina, for the purpose of hiding him from the authorities. Taylor stayed at [the home of] Jeanette Goodman[, the mother of two of Petitioner's children and Shelia's sister,] and worked in a clothing store owned by [Petitioner] called Mad Flavors. The store was originally in the name of Sheila Goodman's mother, and later in the name of Jeanette Goodman. On at least one occasion, Taylor's girlfriend and his child visited him in North Carolina. Jeanette Goodman testified that it did not appear as if Taylor was afraid of [Petitioner] when he was living in North Carolina and working at [Petitioner]'s store.

[Petitioner] told several trial witnesses that Taylor was the only witness to a prior killing of which [Petitioner] was accused. [Petitioner] told Kimmy Wilkins, a former girlfriend, that Taylor was a witness to a murder, that Taylor was making too many phone calls and that Wilkins should keep close to him. [Petitioner] later told Wilkins that "he was going to get [Taylor] clipped." John

Barnes, a friend who stayed with [Petitioner] and Taylor in North Carolina and who drove Taylor and [Petitioner] back to New Jersey just before Taylor's murder, testified that [Petitioner] told him that Taylor was a witness against him in a homicide case, and that the "feds" were calling the Mad Flavors store looking for Taylor. This appeared to bother [Petitioner]. Michael Williams testified that [Petitioner] and Sorey were friends, that [Petitioner] said that he and his friends helped each other out, and that [Petitioner] would get the names of witnesses from his lawyer so that he could go after those witnesses. Finally, [Petitioner] told Jeanette Goodman that Taylor was the only witness against him in a murder case.

In December 1996, [Petitioner] told Sheila Goodman that he was tired of watching his back and tired of watching Taylor. She agreed to [Petitioner]'s request to allow Taylor to stay at her apartment in Bloomfield. Toward the end of December 1996, Barnes, [Petitioner], Taylor, and another individual drove back to New Jersey from North Carolina in [Petitioner]'s SUV. Shortly thereafter, Sheila Goodman drove Taylor to Williamsport, Pennsylvania to pick up his girlfriend and son and brought them back to her apartment on 17 Dodd Street in Bloomfield. While [Petitioner] was in New Jersey, he visited the home of Kimmy Wilkins. Stacy Lassiter, who was staying with Wilkins, overheard [Petitioner] state that he did not think anyone there would see [Taylor] again because [Petitioner] intended to kill him.

Barnes and [Petitioner] returned to North Carolina. On the day of Taylor's murder, January 2, 1997, [Petitioner] had arranged by phone with both Wilkins and Sheila Goodman to transport Taylor and his girlfriend to Sheila Goodman's apartment. Throughout the day, [Petitioner] made several calls from the store in North Carolina to Goodman's apartment. Wilkins, Shelia Goodman, Taylor, and Taylor's girlfriend were present that afternoon. [Petitioner] called Wilkins and asked her to take Taylor to the "Chinese store" at the corner of Dodd and Prospect. [Petitioner] said that Wilkins would not get hurt, and asked whether she trusted [Petitioner], to which she responded affirmatively. [Petitioner] added that they were "going to take care of [Taylor]."

Shelia Goodman saw Wilkins leave with Taylor to go to the "Chinese store" around ten o'clock that evening. Wilkins testified that when she and Taylor arrived at the "Chinese store," they discovered it was closed. As they began to return to Sheila Goodman's apartment, Wilkins saw an individual come out of an alley and lift a weapon. Taylor started running, the gunman chased after him, Taylor screamed and then Wilkins heard a gunshot.

4

Wilkins could not identify the shooter.  Later that evening, Sheila Goodman learned that Taylor had been murdered.

The chase was witnessed by Alfred Mulhearn, a cab driver. He had just dropped off a fare and was traveling through Bloomfield on his way to pick up a fare.  Mulhearn saw the gunman knock Taylor to the ground and shoot him with a shotgun.  The shooter then ran toward East Orange.  The shooter made no attempt to remove anything from Taylor's pockets.

William Smith lived at 23 Dodd Street in Bloomfield.  He overheard Taylor say "he is going to kill me" followed by the gunman chasing Taylor.  Smith later viewed a photo array, from which he tentatively identified Sorey as the gunman.  Smith also testified that he thought the person being chased was a woman due to the high pitch of the victim's voice.  In addition, Smith made an in-court identification of [Petitioner] as the person who shot Taylor. It was undisputed, however, that [Petitioner] was in North Carolina at the time Taylor was shot.  Taylor died of a shotgun wound to the right lower back.

. . . .

Prior to trial, [the trial judge] ruled that Taylor's 1996 testimony in a *Wade* hearing conducted in anticipation of [Petitioner]'s initial trial for the murder of Lewis would be admissible at trial.  She barred admission of a statement that Taylor had given to police.

In the course of the State's case, the prosecutor elicited through Lt. Irving Bradley, and over the objection of [Petitioner], that Shawn Taylor identified [Petitioner] as one of the persons involved in the murder of Lewis.  Specifically, Bradley testified that Taylor arrived at the precinct and informed Bradley that he had information about the death of Lewis.  During the interview, Taylor informed Bradley  that [Petitioner], known to Taylor as Habib, and Alkabir Sorey were responsible for Lewis's death.  Once Taylor revealed the names, Bradley left the interview, procured some photographs, and compiled two six-photo arrays.  One included a photo of Habib, the other of Sorey.

Bradley then testified that he presented Taylor the photo array containing the photo of Habib.  Taylor was not informed that Bradley believed that it contained the photo of Habib.  Taylor told Bradley that photo number 4 was the man he knew as Habib.  Photo number 4 was a picture of [Petitioner].

5

> Next, Bradley showed Taylor the photo array containing the photo of Sorey, again without informing Taylor that he believed that it contained the photo of co-defendant Sorey.  In short order, Taylor identified a photo and signed his name on the back.  The photo depicted [Petitioner's] co-defendant Sorey.
>
> In the course of Assistant Prosecutor DeMarco's testimony, Taylor's testimony at the 1996 *Wade* hearing was read to the jury.  Given the context of its admission, it is clear that it served two purposes.  First, the prior testimony served to identify [Petitioner] as one of the persons involved in Lewis's 1994 killing, and second, it served as evidence of [Petitioner]'s tampering with a witness.

(ECF No. 13-2 at 5-9.)

Following his trial, a jury found Petitioner guilty of second degree conspiracy to commit murder, first degree attempted murder related to the murder of Taylor, second degree aggravated assault against Taylor, the murder of Lewis, third-degree unlawful possession of a .40 caliber handgun, second degree possession of a handgun for an unlawful purpose, fourth degree unlawful possession of hollow point bullets, third degree conspiracy to commit witness tampering, third degree witness tampering, third degree hindering prosecution, second degree conspiracy to commit murder, the purposeful and knowing murder of Taylor, third degree unlawful possession of a shotgun, second degree possession of a shotgun for an unlawful purpose, and third degree unlawful possession of a sawed-off shotgun.  (*Id.* at 3-4.)  Following the merger of relevant counts, the sentencing judge "imposed a life term of imprisonment with thirty years of parole ineligibility" for the murder of Lewis, a consecutive life term with thirty years parole ineligibility for the murder of Taylor, a concurrent twenty year term for the conspiracy to commit murder, concurrent five year terms on the weapons charges, and a concurrent eighteen month term for the possession of hollow points.  (*Id.* at 4.)

Petitioner appealed, and the Appellate Division affirmed Petitioner's conviction and sentence as to all but one claim – a claim asserting that the prosecutor had committed misconduct

by making use of a theory of the case at trial suggesting that Sorey was involved in the murders, despite another individual, Damen Wise, claiming that he had been with Petitioner during the murder of Lewis rather than Sorey.  (*Id.* at 10-12.)  As to that claim, the Appellate Division remanded the claim to the trial court for a determination as to when Wise's claims became known to the parties. (*Id.*)

On remand, the trial court determined that Wise's claimed involvement, and Sorey's apparent non-involvement, in Lewis's murder became known to the State in October 1997. (*See* ECF No. 13-3 at 2.)  The prosecutor's office memorialized Wise's interview in an October 1, 1997 report, and the State provided the report to the defense in a discovery package in November 1997, well before trial. (*See id.*)  Based on these conclusions, the Appellate Division ultimately found no prosecutorial misconduct as the theory presented by the State— that Sorey had been involved— was supported by the evidence provided at trial and Petitioner had access to Wise's contrary assertions had he wished to make use of them. (*Id.* at 2-3.)  After the Appellate Division affirmed Petitioner's conviction and sentence in their entirety, Petitioner sought certification from the New Jersey Supreme Court, which was denied in May 2008.  (ECF No. 13-4.)

## II.   LEGAL STANDARD

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846-47 (3d Cir. 2013).  Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give

great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta[,]" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III.   **DISCUSSION**

### A.   **Petitioner's Confrontation Clause and Identification Claim**

In his first claim, Petitioner contends that the admission of the identification of Shawn Taylor against him at trial violated his rights under the Confrontation Clause of the Sixth Amendment. Petitioner also contends that the identification should not have been admitted in any event because it was not sufficiently reliable. Turning first to the Confrontation Clause issue, while the Confrontation Clause protects a criminal defendant from the admission of testimonial

hearsay made by a witness who was not available at trial, the prohibition of testimonial hearsay simply does not apply where the unavailable witness previously testified in a judicial proceeding at which the defendant had an opportunity to question or cross-examine him.  *See Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).  Where the criminal defendant had an opportunity to cross-examine the witness at the prior proceeding from which the testimonial hearsay in question comes, that fact is dispositive of his claim and there is no Confrontation Clause violation when that testimony is admitted at trial.  *Id.* at 54-56.  Here, the state courts rejected Petitioner's Confrontation Clause claim because there was no error – Taylor's statements came from a *Wade* hearing where Petitioner had ample opportunity to question Taylor and subject his identification to examination.  Consequently, there was no Confrontation Clause error, and the state court's ruling on this issue was neither contrary to nor an unreasonable application of *Crawford* and its progeny.

Petitioner also asserts that Taylor's identification should have been suppressed as it was insufficiently reliable.  The Appellate Division rejected this contention, finding that the evidence presented at the 1994 *Wade* hearing clearly indicated that the procedure used was not impermissibly suggestive and that there was no substantial likelihood of misidentification in any event as Taylor knew Petitioner and Sorey well.  The Supreme Court set the standard for determining the admissibility of an out of court identification in *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977).  In *Manson*, the Court held that an identification procedure violates due process and the resulting identification is therefore inadmissible only where the procedure used by the state was "unnecessarily suggestive and . . . create[d] a substantial risk of misidentification."  *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006); *see also United States v. Anthony*, 458 F. App'x 215, 218 (3d Cir. 2012).  Although reliability is "the linchpin in determining the admissibility of identification testimony," *Manson*, 432 U.S. at 114, the question of whether an

identification is reliable need only be addressed where the procedures used to procure that identification were themselves suggestive. *Id.* at 107-14; *see also State v. Henderson*, 208 N.J. 208, 218-20 (2011).

The Appellate Division's rejection of Petitioner's claim is well supported by the record. The record indicates that Taylor was shown two sets of arrays, one containing Petitioner's photo and one containing Sorey's, that Taylor was not told that the suspects were in either array, and Taylor picked out both Petitioner and Sorey. Nothing in the record suggests that this procedure was in any way unduly suggestive or created a substantial risk of misidentification in light of Taylor's ample familiarity with Petitioner and Sorey. Because there was no evidence of suggestive procedures and no substantial risk of misidentification, the state court's decision to admit the identification testimony was neither contrary to nor an unreasonable application of *Manson* or its progeny. Petitioner is thus not entitled to habeas relief on his identification claim.

### B. Petitioner's Speedy Trial Claim

Petitioner next contends that he was denied his right to a speedy trial given the delay between his indictment in 1997 and trial in 2002. The Appellate Division rejected this claim as utterly meritless without further comment. To determine whether a petitioner's Sixth Amendment right to a speedy trial has been violated, a court "must consider both the defendant's and the prosecution's conduct and consider four factors among others specific to the given case, namely: (1) the length of the delay; (2) the reason for the delay; (3) whether, when, and how the defendant asserted his right to a speedy trial; and (4) prejudice to the defendant by the delay. *Barker v. Wingo*, 407 U.S. 514, 530 [(1972)]." *United States v. Tulu*, 535 F. Supp. 2d 492, 503 (D.N.J. 2008); *see also United States v. Claxton*, 766 F.3d 280, 293 (3d Cir. 2014); *United States v. Battis*, 589 F.3d 673, 678 (3d Cir. 2009). None of these factors is "'either a necessary or sufficient condition,' and the factors 'must be considered together with such other circumstances as may be relevant.'"

*Battis*, 589 F.3d at 678 (quoting *Barker*, 407 U.S. at 533).  When evaluating delay, the central issue is "whether the government or the criminal defendant is more to blame for [the] delay." Government created or neutral causes for delay (such as negligence, busy court schedules, etc.) weigh against the state to varying extents according to the state's culpability for the delay, while delays attributable to joint requests, extensive pretrial proceedings, or a petitioner's own actions weigh against the petitioner.  *See Doggett v. United States*, 505 U.S. 647, 651 (1992); *see also United States v. Corbin*, 607 F. App'x 136, 139 (3d Cir. 2015).  In evaluating the prejudice prong of *Barker*, the Court's chief concern should be what impairment, if any, accrued to the defense based on the passing of time, the dimming of memories, and the loss of potentially exculpatory evidence.  *Doggett*, 505 U.S. at 654; *Barker*, 407 U.S. at 532.

The state courts' rejection of Petitioner's claim is neither contrary to nor an unreasonable application of *Barker* and its progeny.  While Petitioner places much of the blame for the delay in his prosecution to state and federal criminal proceedings in other criminal matters which occurred prior to his trial in this matter, the Court notes that Petitioner himself filed a number of pre-trial motions which also contributed to the delay in his trial proceedings.  Indeed, Petitioner did not even raise the speedy trial issue until June 2001, several years after his indictment.  In any event, Petitioner has failed to show that he was in any way prejudiced by the delay in his criminal proceedings, much of which delay was the result of Petitioner's pre-trial motions and scheduling difficulties inherent with an individual subject to at least three separate criminal prosecutions for serious felonies.  In light of the lack of any clear prejudice to Petitioner from the delay in his proceedings, and Petitioner's own part in delaying the proceedings through pretrial motions and the like, this Court cannot conclude that the state courts misapplied or misconstrued *Barker* in denying Petitioner's speedy trial challenges.  Petitioner is therefore not entitled to habeas relief on this basis.

### C.   Procedural Default and Petitioner's Actual Innocence Claims

Several of the claims Petitioner raises in his next series of merits claims were either not properly raised on appeal in the state courts after being denied at the trial level or were not fully exhausted and may now not be raised in state court as they are barred, as noted in the Appellate Division's opinion on Petitioner's second PCR appeal, and are therefore procedurally defaulted. *See, e.g., O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (claims which are barred by an adequate state law ground, including those which have not been properly exhausted but are clearly subject to a state procedural bar are considered to be procedurally defaulted in a habeas proceeding). Pursuant to the procedural default doctrine, "federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds." *Dretke v. Haley*, 541 U.S. 386, 392 (2004). Habeas courts may therefore not review the wisdom of state law procedural hurdles and may in turn generally "not address the merits of a procedurally-defaulted claim if the state court opinion includes a plain statement indicating that the judgment rests on a state law ground that is both 'independent' of the merits of the federal claim and an 'adequate' support for the court's decision." *Campbell v. Burris*, 515 F.3d 172, 176 (3d Cir. 2008) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). A habeas petitioner may only obtain relief on a claim which has been procedurally barred by either showing cause and actual prejudice for the default, or that he is actually innocent of the crime for which he was convicted. *Dretke*, 541 U.S. at 393.

In his current petition, Petitioner presents no clear basis for a finding of cause and prejudice, and this Court perceives no cause for excusing Petitioner's default from the record presented. Petitioner does argue, however, that he is actually innocent of the charged crimes, based largely on a computer record which he believes establishes he was in a Newark police station at the time of Lewis's murder. In order to make out a gateway claim of actual innocence, a petitioner

must show more than mere legal insufficiency – he must show that he is factually innocent of the charged crime insomuch as it is "more likely than not that no reasonable juror would have convicted him." *Reeves v. Fayette SCI*, 897 F.3d 154, 160-61 (3d Cir. 2018). This requires that a petitioner present "new, reliable evidence" and show by a preponderance of the evidence that no reasonable juror could have convicted him. *Id.*

Here, Petitioner bases his actual innocence argument on what he characterizes as a "police report" indicating that he reported a robbery within minutes of the time of the murder which would prevent him from having been the murderer as he believes it places him in a police station at the time. As the state courts noted in finding this claim procedurally barred, however, the "report" does nothing of the sort. The report on which Petitioner relies provides very little information. It indicates only that at "2:33" on August 20, 1994, there was a report of "Robbery – Highway Gun" at 61 N. Munn Avenue. (ECF No. 73-16 at 7-8.) It does not indicate that Petitioner was the victim of or was in any way involved in this report. It does not indicate that the report was given in person at the police station rather than phoned or otherwise called into the station. It does not place Petitioner in any specific place at the time of the murder, and it essentially provides evidence of nothing other than the bare assertion that *someone* reported some kind of robbery, which occurred shortly after Lewis's murder, from an unknown location at some point in time. Although a letter from the East Orange Police Department does indicate that the incident number on this computerized record "relates to victims" including Petitioner and Sorey, that letter also states that there are no "physical records on file." (*See* ECF No. 73-17 at 17.) Even giving Petitioner the benefit of the letter in question, the two documents do not provide *any* information about what the alleged robbery entailed, when it was reported, from what location it was reported, or to whom the report was given. The documents on their face thus provide little, if any, support for Petitioner's claim that they establish an alibi for Lewis's murder. Given the considerable evidence of his guilt

provided at trial, including Taylor's identification and other witnesses who placed him at the scene of the murder claiming credit for the death of Lewis shortly afterwards, Petitioner has utterly failed to show that no reasonable juror could have found him guilty in light of the robbery "report."[1] Petitioner has thus utterly failed to show that he is actually innocent, and he has provided no basis for evading the procedural default bar applicable to many of his claims. Those claims, as noted below, may therefore not provide a basis for habeas relief in this matter. To the extent Petitioner intended his actual innocence claim to serve as a stand-alone basis for relief, and even assuming *arguendo* that such a claim could provide a basis for habeas relief, Petitioner has failed to make the requisite showing of innocence and has not provided a basis for relief in this matter.

### D.    Petitioner's Prosecutorial Misconduct Claims

In his next series of claims, Petitioner contends that the prosecutors involved in his case committed misconduct which warrants the reversal of his conviction. The state argues that some of these claims were either not properly exhausted, and are thus defaulted as Petitioner can no longer return to exhaust, or are otherwise barred because they were not raised at all levels of the state appellate court system during direct or PCR appeals. Having reviewed the record, it appears that at least some of these claims were exhausted and do not appear procedurally barred, although it appears that Petitioner's knowing use of false testimony and cumulative misconduct claims were only raised in his barred second PCR petition. The cumulative and false testimony claims are thus

---

[1] In addition to this report, Petitioner raises several other issues—all of which were procedurally defaulted when Petitioner's second post-conviction relief petition was barred by the state courts—in support of his claim of innocence including alleged deficiencies in search and arrest warrants, allegedly false testimony by certain witnesses, and alleged misconduct by various state figures including police and prosecutors. None of these claims are supported by documentary evidence clearly showing the knowing use of false testimony or the like, and in any event, none actually show in any way that Petitioner is *factually* innocent of the murders for which he was convicted. At best, Petitioner presents claims of error and impropriety, none of which are so severe that no reasonable juror could find him guilty, and his actual innocence claim thus clearly fails.

barred as discussed above, although the Court will briefly discuss them with Petitioner's other misconduct claims insomuch as they are related to claims that were properly raised.

The duty of a prosecutor in a criminal proceeding is to see that justice is done, and as such prosecutors must "refrain from [the use of] improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also United States v. Bailey*, 840 F.3d 99, 124 (3d Cir. 2016). While a prosecutor "may strike hard blows[,] he is not at liberty to strike foul ones." *Berger*, 295 U.S. at 88; *Bailey*, 840 F.3d at 124. A criminal conviction, however, "is not to be lightly overturned on the basis of a prosecutor's [conduct] standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985). Prosecutorial misconduct will therefore only warrant habeas relief where it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *see also Copenhefer v. Horn*, 696 F.3d 377, 392 n.5 (3d Cir. 2012).

In his first series of prosecutorial misconduct claims, Petitioner asserts that the prosecution committed violations of the doctrine announced in *Brady v. Maryland*, 373 U.S. 83 (1963), by "suppressing" the phone records for his store and an alleged original arrest warrant different from the one presented at trial, which would have listed a different address than the location at which the weapon was found. Under *Brady*, prosecutors bear an "affirmative duty to disclose [material] evidence favorable to a defendant." *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (citing *Brady*, 373 U.S. 83.) "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). In *Strickler v. Greene*, the Supreme Court clarified that "[t]here are three components of a true *Brady* violation: The evidence at issue must be

favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." 527 U.S. 263, 281-82 (1999).

Petitioner first asserts that the state suppressed the phone records of his store in North Carolina, and he contends that the records would have permitted him or counsel to more directly cross-examine Kimmy Wilkins to suggest that he did not direct her to take Taylor to the Chinese Store prior to the murder. It is not clear from the current record when and how Petitioner obtained the copy of the phone records he now possesses. But even assuming that the phone records were not provided by the State prior to trial, Petitioner has failed to show that the records are material or that he was actually prejudiced by his alleged lack of access to them. Petitioner's materiality argument rests entirely on the fact that, after Taylor was killed, there were several calls between Mad Flavors and the home at which Wilkins was present, and that because these calls happened *after* Taylor was killed at 10:30 p.m., Petitioner could not have told Wilkins to take Taylor to the store and the call records could therefore have been used to impeach her. The problem with this assertion, however, is that Wilkins herself did not specifically identify the time at which she was called and told to take Taylor to the store, and the same records on which Petitioner relies clearly show several calls from the store to Wilkins's location and from Wilkins's location to the store. Those calls include calls between Wilkins's location and Petitioner's store at 9:21 p.m., 10:09 p.m., 10:13 p.m., 10:14 p.m., and 10:23 p.m. Although each of these calls was short, in the aggregate the records do not actually undercut Wilkins's testimony and still provide plenty of phone time within which Petitioner could have given the directions to Wilkins to take Taylor to the store. The records thus do not actually serve as impeachment to Wilkins – if anything they provide support for her testimony that there were calls back and forth prior to the shooting of Taylor. The records were thus of little, if any, impeachment value, and certainly were not material,

16

nor was Petitioner truly prejudiced by their lack as his counsel amply and ably cross-examined Wilkins, including getting her to admit that she told lies to the police in her initial statements. The alleged suppression of the phone records thus was not a *Brady* violation and provides no basis for habeas relief.

Petitioner next asserts that the prosecution suppressed an alleged "original" arrest warrant which he believes listed his address as an address other than Sorey's home where the gun was found, based on his reading of various police reports. It is unclear from the record whether such an "original" warrant actually exists – it instead appears that Petitioner merely *assumes* such an "original" warrant was made because a police report authored by the witness who discussed the warrant at trial states that a warrant was obtained and references Petitioner's address in that warrant as 17 Lennox Avenue rather than 215 North 9th Street, where Sorey resided and the gun was found. (*See* ECF No. 73-9 at 41.)  At best, it is thus unclear that any such document was suppressed.

Even if such a document was suppressed, however, it would hardly have been material. If there were a second warrant that listed the 17 Lennox Avenue address, it merely would suggest that Petitioner was associated with at least those two addresses. Even if Petitioner were correct in assuming that it would show that he did not actually reside at the place where the murder weapon used in the Lewis killing was found, it would be of at best limited benefit to him. Ample evidence in the record still connects Petitioner directly to Sorey, who it is not disputed did live at the listed address, and that Petitioner's friend who was identified by Taylor as having been present at the Lewis murder possessed the murder weapon after the fact would hardly prove Petitioner innocent. Indeed, as the Appellate Division noted on the appeal from the denial of the first PCR petition, counsel was able at trial to directly dispute Petitioner's address during his summation, and whether Petitioner resided at 17 Lennox or 215 North 9th Street is ultimately of little value to him. Certainly, the Court can say that the possession of an "original" warrant, if such a document did

exist, would not be sufficient to affect the outcome of Petitioner's trial. Even if Petitioner had such a document, he would still be directly and unavoidably connected to the 9th Street apartment as Sorey resided there, and witnesses placed them together during the shooting. The alleged document was thus not material and did not prejudice Petitioner. As Petitioner was not prejudiced by the alleged suppression of the "original" warrant, he is clearly not entitled to habeas relief on that basis.

Petitioner next argues that the prosecution committed misconduct in presenting the "false testimony" of Detective Bradley regarding the police report, and the "false" testimony of other witnesses including Wilkins and Taylor. "The Supreme Court has long held that the state's knowing use of perjured testimony to obtain a conviction violates the Fourteenth Amendment. *See Giglio v. United States*, 405 U.S. 150, 153 . . . (1972); *Napue v. Illinois*, 360 U.S. 264, 269 . . . (1959); *Pyle v. Kansasi,* 317 U.S. 213, 216 . . . (1942); *Mooney v. Holohan*, 294 U.S. 103, 112 . . . (1935)." *Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004). Such a violation will occur where the state either knowingly uses perjured testimony, or, knowing the testimony of a witness is false, allows false testimony to go uncorrected. *Id.* To make out such a claim, a petitioner must show that a witness provided false testimony, the state knew or should have known that the testimony was false, the testimony went uncorrected, and that there is a reasonable likelihood that the false testimony could have affected the trial's verdict. *Id.* A "[d]iscrepency [in witness testimony] is not enough to prove perjury . . . [as there] are many reasons testimony may be inconsistent; perjury is only one possible reason." *Id.* at 249.

Petitioner only vaguely describes the testimony he believes was false, and indeed fails even to identify all witnesses he believes testified falsely. The only witnesses he specifically identifies are Taylor, whose identification he believes was false in light of the recantation at the *Wade* hearing; Kimmy Wilkins, whose testimony the Court gathers Petitioner believes was false in light

18

of his contention that it doesn't match his phone records discussed above; and Detective Bradley, who Petitioner believes testified falsely because he suggested that Petitioner resided at the apartment where Sorey resided. Although Petitioner *believes* these witnesses testified falsely, he has shown no such thing. Nothing Petitioner has provided shows that these witnesses actually gave false testimony, as opposed to testimony with which Petitioner disagrees, and in any event nothing provided shows the state knew them to be giving false information. Petitioner was free, as he did on cross examination and in summation at trial, to dispute aspects of their testimony and express his disagreement with or disbelief of their statements, but that does not render their testimony false. As Petitioner has not shown that the state made knowing use of false testimony, he has failed to demonstrate misconduct and these prosecutorial misconduct claims therefore provide no basis for habeas relief.

In his next series of prosecutorial misconduct claims, Petitioner contends that the prosecution relied on a known false theory of the case – that Sorey, and not Damon Wise, was with Petitioner when he shot Lewis – in opposing motions to sever and in comments during summations, and in any event failed to timely disclose the Damon Wise proffer prior to trial. All of these issues were the subject of the remand on direct appeal, which resulted in the Appellate Division rejecting Petitioner's claims. Specifically, the Appellate Division found that the Damon Wise information *was* turned over to the defense well in advance of trial, and that in any event the theory of the case used by the prosecution – that Sorey was with Petitioner during the shooting of Lewis – was well supported by the evidence produced at trial and thus was a fair theory to pursue and on which to comment. These decisions were neither contrary to nor an unreasonable application of federal law. Clearly, the record indicates that the defense was provided with the information regarding Damon Wise before trial and could have called him as a witness if it had wanted to do so. The reason the defense did not call Damon Wise to "defeat" the state's theory of

the case is clear – Damon Wise in no way helps Petitioner's case.  Although Damon Wise's claim

to have been with Petitioner during the Lewis shooting did help Sorey evade the charges related

to this matter, Mr. Wise still places the literal smoking gun in Petitioner's hand, which was directly

inculpatory.  The evidence at trial likewise contains testimony placing Sorey on the bike with

Petitioner.  That Wise would dispute that evidence does not per se make the evidence false or the

prosecution's reliance on that evidence at Petitioner's trial improper.  The prosecution's use of the

Sorey theory throughout trial was an entirely fair reading of the evidence in the record and was not

misconduct.  This claim therefore provides no basis for habeas relief.  As Petitioner has not shown

that this claim or any of his prosecutorial misconduct claims denied him a fair trial, Petitioner's

cumulative prosecutorial error claim is likewise without merit in addition to being procedurally

defaulted and is denied as such.

### E.    Petitioner's Ineffective Assistance Claims

In his remaining claims, Petitioner contends that he received ineffective assistance of

counsel.  The standard applicable to claims of ineffective assistance of counsel is well established.

> Claims of ineffective assistance are governed by the two-prong test
> set forth in the Supreme Court's opinion in *Strickland v.*
> *Washington*, 466 U.S. 668 (1984).  To make out such a claim under
> *Strickland*, a petitioner must first show that "counsel's performance
> was deficient.  This requires [the petitioner to show] that counsel
> made errors so serious that counsel was not functioning as the
> 'counsel' guaranteed by the Sixth Amendment."  *Id.* at 687; *see also*
> *United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).  To
> succeed on an ineffective assistance claim, a petitioner must also
> show that counsel's allegedly deficient performance prejudiced his
> defense such that the petitioner was "deprive[d] of a fair trial . . .
> whose result is reliable."  *Strickland*, 466 U.S. at 687; *Shedrick*, 493
> F.3d at 299.
>
>     In evaluating whether counsel was deficient, the "proper
> standard for attorney performance is that of 'reasonably effective
> assistance.'"  *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005).  A
> petitioner asserting ineffective assistance must therefore show that
> counsel's representation "fell below an objective standard of

reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

In his first claim of ineffective assistance, Petitioner contends that trial counsel failed to adequately cross examine Detective Bradley on the address discrepancy between the arrest warrant for Petitioner and his police report discussed above. The Appellate Division rejected this claim, noting that Petitioner had failed to show that he had never lived at Sorey's address and had in any event failed to show prejudice. As discussed above, the address discrepancy was not of chief importance at trial – it was mentioned only briefly by the detective, and even if Petitioner did not live at that address, the weapon used in the Lewis murder was still located at the home of

Petitioner's friend and charged co-conspirator who was placed with him at the time of the murder by witness testimony provided at trial. As the detective's address testimony was brief, and the alleged issue of relatively minor importance in light of Petitioner's connections to Sorey, and as counsel in any event provided argument regarding the discrepancy during summations, it is clear that Petitioner was not prejudiced by counsel's alleged failure to go into the issue in depth with the detective – a tactic which would have done little more than allow the detective to further connect Petitioner to the apartment where the gun was found and highlight an address issue which received only brief discussion during trial.

Petitioner next contends that counsel was ineffective for failing to cross-examine Ms. Wilkins with the store telephone records. As discussed above, however, those records do not directly contradict her testimony and in any event do little more than show that Petitioner's store phone called the apartment where Wilkins was on the night of the murder many times both before and after the shooting. Petitioner has utterly failed to show that he was prejudiced by this alleged failure, and nothing in the phone records clearly provides an avenue to undercut Ms. Wilkins's story. In light of the thorough and effective cross-examination counsel did provide as to Ms. Wilkins in relation to changes in her story to police, it is clear that Petitioner was not prejudiced and this claim serves as no basis for habeas relief.

In his final ineffective assistance claim, Petitioner contends that counsel failed to adequately use the Damon Wise statement both in his efforts to have the Lewis and Taylor murders tried separately and to challenge Taylor's statements at trial. The Appellate Division rejected this claim as nearly farcical – the Wise statement, although clearly helpful to Sorey, was nothing but inculpatory for Petitioner – Wise placed the murder weapon directly in Petitioner's hands, which in turn clearly connects Taylor's death to the Lewis murder which Wise stated was committed by Petitioner. Thus, in direct contravention of Petitioner's argument, use of the Wise statement during

his severance motion would only have highlighted the connections between the two killings – it would place the murder weapon, found in Sorey's apartment, in Petitioner's hands, inculpate Petitioner in Lewis's murder, and clearly provide Petitioner's motive in eliminating Taylor as a potential witness against him a few years later.  Clearly, any severance motion premised on the Wise statement or calling or use of Wise's statement at trial had only the capacity to severely hinder Petitioner's case and certainly there is no reasonable likelihood that Petitioner would have prevailed in his severance motion or at trial had Wise's statement been used.  Petitioner was thus not prejudiced by counsel's failure to "make use" of Wise's statement in seeking severance or at trial.  Petitioner has thus failed to show ineffective assistance of counsel, and this claim provides no basis for habeas relief.

In a related claim, Petitioner attempts to present a cumulative ineffective assistance claim, suggesting that even if the individual claims did not prejudice him, the combined claims, in addition to the alleged prosecutorial misconduct discussed above, would warrant relief.  As discussed previously, however, Petitioner has utterly failed to show wrongdoing or prejudice as to any of his misconduct or ineffective assistance claims, and they fare no better in the aggregate than they do individually.  Petitioner has not shown prejudice, and his cumulative ineffective assistance claim therefore fails to provide any basis for habeas relief, even were the Court to find this cumulative error claim not procedurally barred.

**F.      Petitioner's Sufficiency of the Evidence Claim**

Petitioner next challenges the sufficiency of the evidence against him at trial.  When a habeas petitioner presents a claim challenging the sufficiency of the evidence provided at trial, "a reviewing court must ask 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Eley*, 712 F.3d at 847 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319

(1979)).  A court sitting in habeas review may therefore overturn a conviction based on insufficient evidence only "if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 324).  "Under *Jackson*, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012).  Under this "deferential federal standard," juries have "broad discretion in deciding what inferences to draw from the evidence presented at trial" and federal courts must not "unduly impinge[] on the jury's role as factfinder" by engaging in "fine-grained factual parsing." *Id.*  Here, there was ample evidence of Petitioner's guilt produced at trial, including eyewitness identifications, witnesses who placed Petitioner at the scene of the Lewis shooting taking credit shortly afterwards, the murder weapon being recovered from Sorey's apartment, and ample witness testimony establishing Petitioner's foreknowledge of and direct orchestration of Taylor's murder.  Clearly, a rational juror could find Petitioner guilty on this evidence, and Petitioner's sufficiency of the evidence challenge is therefore without merit.  The state court thus did not err in denying Petitioner' motion for a judgment of acquittal, and Petitioner has failed to show any basis for habeas relief.

### G.     Petitioner's Remaining Claims

All of Petitioner's remaining claims (those raised in his grounds numbered seven, eight, nine and ten in the amended petition), to the extent they are distinct from his previously discussed claims, were, by Petitioner's own admission, raised only in his second PCR petition which was procedurally barred.  (*See* ECF No. 67 at 13-19.)  As explained above, these claims cannot serve as valid bases for habeas relief as Petitioner has not shown cause and prejudice to excuse his default or that he is actually innocent of the crimes of which he was convicted.  Petitioner's remaining

barred claims therefore provide no basis for habeas relief.  As all of Petitioner's claims are either without merit or are clearly barred, Petitioner's amended habeas petition is denied.

## IV.   <u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right."  "[A petitioner] satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude [that] the issues presented here are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Because Petitioner's habeas claims are all without merit or are clearly procedurally defaulted for the reasons set forth above, he has failed to make a substantial showing of a denial of a constitutional right, and his petition is not adequate to receive encouragement to proceed further.  This Court therefore denies Petitioner a certificate of appealability.

## V.   <u>CONCLUSION</u>

In conclusion, Petitioner's amended habeas petition (ECF No. 67) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability.  An appropriate order follows.

_Mashipp_

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE
